**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Erin M. LEWIS, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 25, 2011.

Filed Jan. 30, 2012.

Brian DePowell, Harrisburg, for appellant.

David J. Arnold, Jr., Assistant District Attorney, Lebanon, for Commonwealth, appellee.

BEFORE: GANTMAN, LAZARUS, and MUNDY, JJ.

OPINION BY GANTMAN, J.:

Appellant, Erin M. Lewis, appeals from the judgment of sentence entered in the Lebanon County Court of Common Pleas, following her jury trial conviction for tam-

pering with public records or information.[1] We affirm.

The relevant facts and procedural history of this appeal are as follows. Between February 14, 2005 and February 25, 2008, the Lebanon County Office of Adult Probation and Parole employed Appellant as a probation officer. In August 2007, Appellant started supervising the probation of Jeffrey Gardner, who was on electronic monitoring. In December 2007, while Appellant was supervising Mr. Gardner's probation, they began an intimate relationship. Appellant and Mr. Gardner made plans to travel together to Atlantic City during the weekend of February 17, 2008.[2] On February 12, 2008, Appellant released Mr. Gardner from electronic monitoring, eleven days ahead of schedule of his six-month period of court-ordered electronic monitoring. When Mr. Gardner discovered that Probation Officer Megan Fertenbaugh planned to be in Atlantic City at the same time, he and Appellant changed their plans and rescheduled their trip for during the weekend of February 24, 2008. Part of Appellant's duties required her to maintain case files on the probationers she was supervising and to make notations of their progress, plans, and whereabouts. Shortly before their planned trip to Atlantic City, Appellant wrote a note in Mr. Gardner's file stating he was visiting Atlantic City with his family; Appellant did not want anyone to know that she and Mr. Gardner were actually traveling together. Appellant left her job with the Lebanon County Office of Adult Probation and Parole on February 25, 2008, for other employment.

Probation Officer Megan Fertenbaugh took over the supervision of Mr. Gardner. In March 2008, Ms. Fertenbaugh learned about the romantic relationship between Appellant and Mr. Gardner. She informed Chief Probation Officer Sally Berry, who asked Chief County Detective John Leahy to assist in investigating the matter. On March 10, 2008, they called Mr. Gardner to the probation office where he admitted his relationship with Appellant. When asked, Appellant confirmed the truth of Mr. Gardner's statements. On March 28, 2008, the Commonwealth charged Appellant with tampering with public records or information and obstructing administration of law or other governmental function.

Appellant and Mr. Gardner married on June 17, 2008. At Appellant's preliminary hearing on July 8, 2008, Mr. Gardner asserted his spousal testimony privilege under 42 Pa.C.S.A. § 5913 and refused to testify. The magisterial district justice honored the privilege but permitted Chief Berry to testify about the information that Mr. Gardner had given during their March 2008 interview. The charges were bound over for trial.

Appellant filed an omnibus pre-trial motion to preclude the Commonwealth from calling Mr. Gardner to testify at trial, based on the Section 5913 spousal testimony privilege. The Commonwealth filed its own motion *in limine* to compel Mr. Gardner's testimony at trial. The Commonwealth argued the Section 5913 spousal testimony privilege should not apply in this case because Appellant and Mr. Gardner married so Mr. Gardner would not have to testify as a witness against Appellant.

Addressing the parties' motions, the court noted the lack of Pennsylvania precedent on the issue of a "collusive" marriage and the interplay of that concept with Section 5913. (*See* Trial Court Opinion, dated February 12, 2009, at 8–14).

---

1. 18 Pa.C.S.A. § 4911.

2. All of the dates in these facts are consistent with those dates provided by the parties in the certified record.

The court examined how other jurisdictions treated the issue of a "collusive" marriage. After considering what constitutes a "collusive" marriage, and its effect on the spousal testimony privilege, the court concluded Section 5913 was unavailable to Mr. Gardner if he had married Appellant to avoid testifying against her. *Id.* at 14. As a result, the court ordered an evidentiary hearing to determine whether the marriage between Appellant and Mr. Gardner was genuine and in good faith or a scheme to keep Mr. Gardner off the stand.

At the April 1, 2009 hearing, the court heard testimony from Mr. Gardner, his parents, and Appellant's parents. At the conclusion of the hearing, the court made two factual findings: (1) genuine love existed between Appellant and Mr. Gardner, which motivated the marriage; but (2) the marriage was hastily conducted several weeks before Mr. Gardner was scheduled to testify at Appellant's preliminary hearing and so scheduled for the express purpose of preventing Mr. Gardner from testifying against Appellant. Relying on *In re Grand Jury Subpoena of [Witness]*, 884 F.Supp. 188 (D.Md.1995) and *Osborne v. State*, 623 P.2d 784 (Alaska 1981), the trial court reasoned that a marriage timed even partly to prevent testimony was "collusive" under Pennsylvania law. Thus, the court barred Mr. Gardner from asserting the Section 5913 spousal testimony privilege at Appellant's trial. (*See* Trial Court Opinion, dated June 18, 2009, at 8). The court granted the Commonwealth's motion to compel Mr. Gardner's testimony, denied Appellant's request to certify the interlocutory order for immediate appeal, and scheduled the matter for trial.

Following trial on September 17, 2009, the jury found Appellant guilty of tampering with public records or information but not guilty of obstructing administration of law or other governmental function. On November 18, 2009, the court sentenced Appellant to six months' probation and imposed a fine of $100.00, plus the costs of prosecution. Appellant timely filed a post-sentence motion for a new trial, which the court denied on April 20, 2009. Appellant timely filed a notice of appeal on May 3, 2009. On May 4, 2009, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant timely filed on May 24, 2009.

Appellant raises two issues on appeal:

DID THE TRIAL COURT ERR IN ITS EMPLOYMENT OF 42 PA.C.S.A. § 5913, RELATING TO THE SPOUSAL TESTIMONIAL PRIVILEGE, BECAUSE THE JUDICIAL INTERPRETATION OF THE STATUTE WAS CONTRARY TO WELL ESTABLISHED CANONS OF STATUTORY CONSTRUCTION, HAD NOT BEEN STRICTLY CONSTRUED IN FAVOR OF THE ACCUSED AS REQUIRED BY THE RULE OF LENITY, AND WAS SUBJECTIVELY APPLIED IN DEROGATION OF THE LEGISLATIVE INTENT EMBODIED IN THE STATUTE?

DID THE TRIAL COURT ERR WHEN IT PERMITTED THE DISTRICT ATTORNEY TO MAKE IMPROPER STATEMENTS DURING BOTH HIS OPENING AND CLOSING ARGUMENTS AND SUBSEQUENTLY REFUSED TO GIVE A CURATIVE INSTRUCTION BECAUSE SUCH STATEMENTS SERVED ONLY TO INFLAME THE JURY'S EMOTIONS AND PREJUDICE THE FINDERS OF FACT CONTRARY TO CLEARLY ESTABLISHED CASE LAW?

(Appellant's Brief at 4).

■ "A motion in *limine* is a procedure for obtaining a ruling on the admissibility

of evidence prior to or during trial, but before the evidence has been offered." *Commonwealth v. Bobin*, 916 A.2d 1164, 1166 (Pa.Super.2007). A trial court's decision to grant or deny a motion *in limine* is generally subject to an evidentiary abuse of discretion standard of review. *Commonwealth v. Moser*, 999 A.2d 602, 605 (Pa.Super.2010), *appeal denied*, 610 Pa. 595, 20 A.3d 485 (2011). Nevertheless, when the court's decision involves the interpretation of a statute, the decision implicates a question of law. *Commonwealth v. Van Aulen*, 952 A.2d 1183, 1184 (Pa.Super.2008), *appeal denied*, 600 Pa. 749, 965 A.2d 245 (2009). On that question, our scope of review is plenary and our standard of review is *de novo*. *Id.* We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm. *Commonwealth v. Reese*, 31 A.3d 708, 727 (Pa.Super.2011) (*en banc*); *Commonwealth v. Heilman*, 867 A.2d 542 (Pa.Super.2005), *appeal denied*, 583 Pa. 669, 876 A.2d 393 (2005).

Generally, with respect to statutes, "the object of all interpretation and construction is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S.A. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). "[I]f the General Assembly supplies definitions of the words comprising a statute, those definitions are binding." *Van Aulen, supra.* Only if the words of the statute are not explicit should courts attempt to establish the intent of the General Assembly by scrutinizing the legislative purpose, goals, circumstances of enactment, former law, consequences, history, and other interpretations of the same statute. 1 Pa.C.S.A. § 1921(c); *Commonwealth v. Reaser*, 851 A.2d 144, 149 (Pa.Super.2004), *appeal denied*, 581 Pa. 674, 863 A.2d 1145 (2004).

In her first issue, Appellant argues the trial court's interpretation of Section 5913 ignores the unambiguous language of the statute and is inconsistent with the Pennsylvania rules of statutory construction. Appellant emphasizes the legislature expressly listed four exceptions in Section 5913, but it made no exception for a "collusive" marriage. Appellant maintains the trial court's decision to read that exception into Section 5913 infringed on legislative territory. Appellant insists the court's decision to compel Mr. Gardner's testimony was prejudicial error that warrants a new trial. For the following reasons, we conclude the court improperly compelled Mr. Gardner to testify at trial in violation of Section 5913, but that ruling constituted harmless error.

■ "The Pennsylvania Rules of Evidence do not modify existing law regarding testimonial privileges. *See* Pa.R.E. 501 (stating: "Privileges as they now exist or may be modified by law shall be unaffected by the adoption of these rules")." *Reese, supra* at 716. In analyzing the application of a testimonial privilege, we observe the general rule that privileges are to be strictly construed, as they contravene the fundamental principle of utilizing all rational means for ascertaining truth. *Commonwealth v. Spetzer*, 572 Pa. 17, 34, 813 A.2d 707, 717 (2002). As exceptions to the rule of relevance and in derogation of the search for truth, testimonial privileges are not lightly created or expansively interpreted. *Commonwealth v. Stewart*, 547 Pa. 277, 282, 690 A.2d 195, 197 (1997).

Pennsylvania recognizes two, distinct spousal privileges: the spousal testimony privilege in Section 5913 and the confidential communications privilege in Section 5914. *See* 42 Pa.C.S.A. §§ 5913, 5914. *See also Spetzer, supra* at 32, 813 A.2d at

716 (stating Sections 5913 and 5914 "involve two distinct rules"). The spousal testimony privilege of Section 5913 allows a husband or wife to refuse to testify against the defendant spouse in a criminal proceeding. *Id.* The confidential communications privilege of Section 5914 is more limited and protects confidential communications made during a lawful marriage; the privilege in Section 5914 belongs to the defendant spouse. *Reese, supra* at 717.[3]

■ The spousal testimony privilege at issue in this case is codified in Section 5913 of the Judicial Code and provides as follows:

### § 5913. Spouses as witnesses against each other

Except as otherwise provided in this subchapter, in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse except that there shall be no such privilege:

(1) in proceedings for desertion or maintenance;

(2) in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them;

(3) applicable to proof of the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other; or

(4) in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

42 Pa.C.S.A. § 5913. Under this Section, the witness spouse owns the privilege to refuse to give testimony against the defendant spouse in a criminal proceeding. *Commonwealth v. Newman,* 534 Pa. 424, 431, 633 A.2d 1069, 1072 (1993); *Commonwealth v. Savage,* 695 A.2d 820, 823 (Pa.Super.1997). The conventional purpose of this privilege is to preserve and protect marital harmony. *Commonwealth v. Blough,* 369 Pa.Super. 230, 535 A.2d 134, 138 (1987). The testifying spouse can waive a Section 5913 privilege. *Newman, supra* at 431, 633 A.2d at 1072.

■ The very foundation for "invoking the marital privilege is the existence of a valid marriage." *Commonwealth v. Maxwell,* 505 Pa. 152, 165, 477 A.2d 1309, 1316 (1984), *cert. denied,* 510 U.S. 995, 114 S.Ct. 558, 126 L.Ed.2d 459 (1993) (discussing spousal privilege outlined in Section 5913). The test is **not** whether the parties believe they are married but whether they are married **under the law.** *Commonwealth v. Valle–Velez,* 995 A.2d 1264, 1268 (Pa.Super.2010), *appeal denied,* 608 Pa. 666, 13 A.3d 478 (2010).[4] "Pennsylvania law gen-

---

**3.** A detailed discussion and overview of the confidential communications privilege in Section 5914 can be found in *Reese, supra.*

**4.** The *Valle–Velez* Court recently addressed the spousal testimony privilege of Section 5913. The issue before the *Valle–Velez* Court was whether spouses who were estranged, separated, and had filed for divorce still qualified for the privilege under Section 5913. *Id.* at 1267 (noting "determination must be made as to whether a couple who has filed for

divorce … is in a 'lawful' marriage"). The Commonwealth sought to compel the testimony of defendant's wife, under the theory that Section 5913 should not apply in cases where the parties were still legally married but no longer married "in fact." This Court rejected the Commonwealth's position and concluded the language of Section 5913 applied to all persons within a lawful marriage, even those who were in the process of divorce. Because the individuals in the case were still lawfully married, the defendant's wife could invoke

erally imposes the burden of proof on the party challenging the privilege." *Reese, supra.*

The issue in the present case is whether the spousal testimony privilege of Section 5913 is available to Mr. Gardner who allegedly married Appellant partly to avoid giving testimony against her in a criminal proceeding; we have uncovered three prevailing approaches to the reach of the spousal testimony privilege: (1) the privilege is not available if the marriage was collusive, *i.e.*, entered to avoid testifying, *see United States v. Apodaca*, 522 F.2d 568 (10th Cir.1975) (representing first view that spousal testimony privilege is not available to either spouse in sham or collusive marriages); (2) the privilege applies to events occurring during the marriage but not to pre-marital events or communications, *see United States v. Clark*, 712 F.2d 299 (7th Cir.1983) (representing second view that spousal testimony privilege does not apply to conduct that took place prior to marriage); and (3) the privilege is available as to all spousal adverse testimony as long as a valid marriage exists, *see State v. Peters*, 213 Ga.App. 352, 444 S.E.2d 609 (1994) (representing position that spousal testimony privilege applies to all spousal testimony where lawful marriage exists when privilege is invoked).

The first position on the spousal testimony privilege (sham marriage) was originally adopted in *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), a case that dealt with a conspiracy involving the War Brides Act and "pretend" marriages undertaken for the sole purpose of gaining admission of aliens to the United States without having to undergo the long delay involved in qualifying for proper immigration. The *Lutwak* Court concluded a witness spouse could be compelled to testify against the defendant spouse if the parties had married in bad faith and used the marriage ceremony in a scheme to defraud authorities.[5] *Id.* at 614–15, 73 S.Ct. at 488, 97 L.Ed. at 601–02. *See also Apodaca, supra* at 571 (following *Lutwak*'s lead and holding spousal testimony privilege was unavailable to either spouse when defendant and prosecution's key witness had no real relationship, yet defendant married witness three days before trial, because circumstances showed marriage was sham and formed only to avoid adverse testimony); *Osborne, supra*[6] (stating court will not "exalt form over substance" by blinding itself to probable motivation for eve-of-trial marriage; affirming trial court's denial of spousal testimony privilege protection to parties who married one week before trial to avoid testifying).

the spousal testimony privilege and refuse to testify against her husband in his criminal case. As a general matter, the *Valle–Velez* Court took care to adhere to the clear language of Section 5913, despite proffered countervailing policy arguments which might favor a more limited application of, or an implied exception to, the privilege. *Id.* Ultimately, the Court rejected the Commonwealth's proposed policy justifications to overcome the privilege and declined to read a new exception into the explicit statutory language. *Id.*

5. *Lutwak* addressed the *passé* notion of "competency" to testify, not the contemporary spousal privilege against testifying. Nevertheless, its reasoning illustrates a perspective on spousal testimony in the context of a fraudulent marriage.

6. Alaska Rule of Criminal Procedure 53 provides generally that the rules "may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that strict adherence to them will work injustice." *Osborne, supra* at 787 n. 4 (citing AK R.CR.P. 53). When *Osborne* was decided, the spousal testimony privilege was an evidentiary rule contained in AK R.CR.P. 26 (which was later rescinded).

Whether a marriage is fraudulent is a fact-sensitive inquiry that generally requires an evidentiary hearing. *See United States v. Saniti*, 604 F.2d 603, 604 (9th Cir.1979), *cert. denied*, 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979). Relevant factors for a court to consider when examining whether a marriage is fraudulent include but are not limited to the timing of the union, whether the couple intends to live together as husband and wife, and whether the couple entered the marriage in good faith. *In re Grand Jury Proceedings (84–5)*, 777 F.2d 508, 509 (9th Cir.1985) (stating mere suspicious timing of union does not alone support finding of sham marriage, where individuals had live-in relationship for some time before subpoena was served on one individual to testify against other individual before grand jury). In this context, when enough facts show the marriage was fraudulent, the spousal testimony privilege cannot be invoked; and a court can compel one spouse to testify against the defendant other spouse in a criminal proceeding. *United States v. Mathis*, 559 F.2d 294, 298 (5th Cir.1977) (holding trial court erred in finding purported wife "unavailable" to testify and admitting her sworn prior statements in *lieu* of her live testimony, where record did not support court's ruling in light of its own finding that remarriage of wife and defendant was fraudulent and wife did not refuse to testify if claim of privilege was denied).

The second approach to the spousal testimony privilege excepts premarital events from protection. *See Clark, supra* (criticizing hyper-factual inquiries necessitated by sham marriage exception to privilege; employing joint-participants exception and acts-prior-to-marriage exception to affirm trial court's finding that privilege did not apply to spouses who co-conspired to steal money from savings and loan; husband could not invoke spousal testimony privilege to avoid testifying against his wife at her criminal trial); *United States v. Van Drunen*, 501 F.2d 1393 (7th Cir.1974), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974) (holding exclusion of testimony from defendant's wife at defendant's trial was not required under spousal testimony privilege, where both spouses participated in unlawful enterprise of transporting illegal aliens, and wife's testimony concerned matters prior to their marriage); *In re Grand Jury Subpoena of [Witness], supra* (illustrating "pre-marital exception" to spousal testimony privilege; declining to enforce spousal testimony privilege to block testimony about acts, events, or communications which occurred before marriage but upholding privilege for events which happened during marriage). The stated objective of these cases is to avoid "mini-trials on the issue of the sincerity of the parties getting married" by creating a blanket rule that pre-marital events are not covered by the spousal testimony privilege.[7] *See id.*

---

7. Federal Rule of Evidence 501 served as the legal underpinning to the decisions in cases recognizing a pre-marital exception to the spousal testimony privilege. Rule 501 vests broad power in the federal courts to develop testimonial privileges in light of reason and experience (stating: "The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless the following provides otherwise: • the United States Constitution; • a federal statute; or • rules prescribed by the Supreme Court....") F.R.E. 501. The United States Supreme Court has said that Rule 501 embodies Congress' intention to continue the evolutionary development of privilege law by providing courts with the flexibility to develop testimonial privileges on a case by case basis. *Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186, 192–93 (1980). Utilizing Rule 501, federal courts have gradually narrowed and limited the spousal testimony privilege. *Id.* (discussing foundations of privilege and

The third approach to the spousal testimony privilege enforces it as to all events or conversations which occurred before or during the marriage, even in cases where certain facts suggest the parties' marriage was insincere or estranged, so long as a lawful marriage exists when the privilege is invoked. *See Valle–Velez, supra* (upholding trial court's decision to permit defendant's estranged wife to invoke spousal privilege in Section 5913, where facts of case did not fall within statutory language as written, including legislatively created exceptions; moreover, spousal privilege encompasses more than confidential communications; witness spouse can invoke spousal privilege even if desired testimony is non-confidential in nature); *Jurcoane v. Superior Court,* 93 Cal.App.4th 886, 113 Cal.Rptr.2d 483 (2001) (stating where legislature has defined evidentiary privileges by statute, courts have no power to expand them or recognize unwritten, implied exceptions; enforcing spousal testimony privilege to prevent wife from being called as witness against accused as long as she remained married to him and chose to exercise privilege; legislature did not include "marital viability" exception to express statutory exceptions, and trial court erred in creating exception based on marital viability); *Peters, supra* (enforcing spousal privilege, although union was formed to avoid testimony and despite potential for abuse of privilege; statute was clear and unambiguous, and facts of case did not fall within one of legislatively enumerated exceptions; privilege can be invoked regardless of underlying motives as long as there is valid, existing marriage). In these cases, certain themes predominate: (1) if the privilege is a creature of statute, it is not subject to judicially-created exceptions; and (2) the language of the spousal privilege statute applies to lawful spouses, regardless of their overt acts, and cannot be overridden or ignored in favor of a more liberal construction ostensibly to protect society in criminal cases. *See id.*

In the instant case, while Appellant supervised Mr. Gardner's probation, they began an intimate relationship. As part of Appellant's supervisory duties, she kept case files on the probationers she was supervising and made notations of their progress, plans, and whereabouts. Shortly before their trip to Atlantic City, Appellant noted in Mr. Gardner's file that he was visiting Atlantic City with his "family" because Appellant wanted to hide the fact that she and Mr. Gardner were actually traveling together.

Right after that trip, Appellant left her job with the Lebanon County Office of Adult Probation and Parole on February 25, 2008. Probation Officer Megan Fertenbaugh took over Mr. Gardner's supervision and learned, in March 2008, about the romantic relationship between Appellant and Mr. Gardner. Ms. Fertenbaugh informed Chief Probation Officer Sally Berry, who asked Chief County Detective John Leahy to assist in investigating the matter. On March 10, 2008, they called Mr. Gardner to the probation office where he admitted his romantic relationship with Appellant. When asked, Appellant confirmed the truth of Mr. Gardner's statements. Soon after, the Commonwealth charged Appellant with tampering with public records or information and obstructing administration of law or other governmental function. Appellant and Mr. Gardner married on June 17, 2008. At Appellant's preliminary hearing on July 8, 2008, Mr. Gardner asserted his spousal

ability of federal courts to weigh contemporary interests when determining whether privilege should be modified). That said, the relaxed standard in Rule 501 of the federal rules of evidence must still bow to a federal statute. *See* F.R.E. 501.

privilege under 42 Pa.C.S.A. § 5913 and refused to testify. The magisterial district justice honored the privilege but permitted Chief Berry to testify about the information Mr. Gardner had provided during their March 2008 meeting.

Before trial, Appellant and the Commonwealth filed motions *in limine* regarding Mr. Gardner's testimony. The court ordered an evidentiary hearing to determine whether the marriage between Appellant and Mr. Gardner was genuine and in good faith or a scheme to keep Mr. Gardner off the stand. At a hearing on April 1, 2009, the court heard testimony from Mr. Gardner, his parents, and Appellant's parents. At the conclusion of the hearing, the court made two factual findings: (1) genuine love motivated the marriage; but (2) the marriage was hastily conducted several weeks before Mr. Gardner was scheduled to testify at Appellant's preliminary hearing so Mr. Gardner could assert his spousal testimony privilege. The court reasoned the marriage was "collusive" under Pennsylvania law, because it was timed to prevent testimony, and barred Mr. Gardner from asserting his spousal testimony privilege at Appellant's trial. (*See* Trial Court Opinion, dated June 18, 2009, at 8). The court granted the Commonwealth's motion to compel Mr. Gardner's testimony at trial, denied Appellant's request to certify the interlocutory order for immediate appeal, and scheduled the trial. Notably, the court found "genuine love" between Mr. Gardner and Appellant had motivated their marriage. The court's decision to find the marriage "collusive" for purposes of the Section 5913 privilege rested entirely on the timing of the ceremony and lack of a wedding reception.

Section 5913 defines the spousal testimony privilege as available to a lawful spouse in a criminal proceeding against the other spouse; the statute also lists four excep-tions. *See* 42 Pa.C.S.A. § 5913(1)-(4) (stating no privilege exists in: (1) actions for desertion and maintenance; (2) criminal cases where one spouse is charged violence against the other spouse or against any minor child in their care or custody; (3) cases where the testimony is applicable to proof of marriage in support of a criminal charge of bigamy; or (4) criminal cases involving charges of murder, rape, or involuntary deviate sexual intercourse). Because the privilege set forth in Section 5913 is a creature of statute, we are bound by its expression and decline to imply exceptions for collusive marriages or pre-marriage events or acts. *See* 1 Pa.C.S.A. § 1921(b) (stating when words of statute are clear and unambiguous, letter of statute is not to be disregarded under pretext of pursuing its spirit).

■ Here, no one disputes that Appellant and Mr. Gardner were lawfully married when he asserted his Section 5913 spousal testimony privilege. Notably, neither the statute nor the exceptions eliminate or limit the privilege for collusive marriages or pre-marriage events or actions. This case involves a spousal testimony privilege defined by statute that contains specific exceptions. *See Com., Dept. of Transp. v. Taylor*, 576 Pa. 622, 630–31, 841 A.2d 108, 113 (2004) (noting legislature fully aware of how to create exceptions to evidentiary privileges, and courts should not read in exception where none exists). This Court's recent decision in *Valle–Velez* addressed Section 5913 as a straight matter of statutory interpretation, eschewing common law or public policy considerations. Like the *Valle–Velez* Court, we see the statutory text of Section 5913 as clear in this instance, and any public policy concepts arguably implied in the statute are irrelevant to our review. *See* 1 Pa. C.S.A. § 1921(b); *Valle–Velez, supra* at 1270 (declining to look beyond express

statutory language to policy considerations favoring "estranged spouse" exception, where statutory language is clear on its face). *See also Commonwealth v. Rabold,* 597 Pa. 344, 951 A.2d 329 (2008) (reiterating that legislature (not courts) "serves primarily to determine public policy in Pennsylvania"). Thus, we refuse to adopt the trial court's rationale for creating an exception to the spousal testimony privilege for a "collusive" marriage [8] on policy grounds; we also reject the trial court's conclusions regarding the applicability of Section 5913 under the circumstances of this case.[9] Therefore, Mr. Gardner owned the spousal testimony privilege when he invoked it; and the court erred in compelling Mr. Gardner to testify at Appellant's trial.

■ Nevertheless, the question still remains whether this error compels a new trial because:

> Not all errors at trial, however, entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial.... Harmless error exists when, *inter alia,* the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence.

*Reese, supra* at 719 (internal citations and quotation marks omitted) Harmless error

is "a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt." *Commonwealth v. Koch,* 39 A.3d 996, 1006, 2011 PA Super 201, 2011 WL 4336634 (2011).

■ Instantly, the Commonwealth's evidence against Appellant included: (1) Mr. Gardner's testimony; (2) Mr. Gardner's statements to Chief Barry and Chief Leahy from the earlier investigation; (3) testimony from Appellant's former co-worker Ms. Fertenbaugh, who authenticated the notations Appellant had made in Mr. Gardner's probation file; (4) Appellant's admissions to Chief Leahy regarding her culpability and confirming the truth of Mr. Gardner's statements; and (5) records from Resorts Casino in Atlantic City, showing a reservation in Appellant's name for February 24, 2008.

Although the trial court should not have compelled Mr. Gardner's testimony, sufficient other evidence showed Appellant's liability. Ms. Fertenbaugh's testimony established Appellant had made the entry in Mr. Gardner's probation file that he was going to Atlantic City "with family." (*See* N.T. Trial, 9/17/09, at 129). In addition, Chief Leahy testified he contacted Appellant to ask her questions about her relationship with Mr. Gardner and her activities regarding the trip to Atlantic

---

**8.** Even courts following the federal "sham" marriage approach to the spousal testimony privilege have stated the timing of the marriage alone is insufficient to support a conclusion that the marriage was a sham. *See In re Grand Jury Proceedings (84–5), supra* at 509. The timing of a marriage will always be a factor; and with a different timing the controversy might not even arise.

**9.** The trial court and the Commonwealth favored federal cases which are unpersuasive,

due to the starkly different framework for testimonial privileges under federal law. Unlike Pennsylvania's statutory scheme, the Federal Rules of Evidence have a more liberal approach to testimonial privileges, which gives federal courts greater flexibility to consider policy justifications and to create exceptions to the spousal testimony privilege in a given case. Also for this reason, the trial court's decision to rely on federal cases is problematic.

City.[10] Appellant said she had nothing to hide; what she had done was wrong but Appellant was willing to accept her punishment. (*See id.* at 149.) Appellant also indicated that she knew about Chief Leahy's discussions with Mr. Gardner and that anything Mr. Gardner told Chief Leahy was true. (*See id.*) Moreover, records from Resorts Casino in Atlantic City confirmed a reservation in Appellant's name during the weekend of February 24, 2008. This evidence was sufficient to prove Appellant's guilt beyond a reasonable doubt as to the tampering with public records charge. In this respect, Mr. Gardner's testimony was merely cumulative of other untainted evidence. *See Reese, supra.* Given the otherwise properly admitted evidence of Appellant's guilt, the court's ruling compelling Mr. Gardner's testimony at trial was harmless error. *See id.* Thus, we decline to disturb the jury's verdict.

In Appellant's second issue, she claims the Commonwealth made improper and potentially inflammatory statements and comparisons to controversial facts not of record during opening and closing statements, which served to stir the passions of the jury and had the potential to create unfair bias against Appellant. Specifically, with regard to the opening statement, Appellant argues the prosecutor referenced the Luzerne County judicial scandal, which was highly improper and inflamed the jury to such an extent that a fair verdict was impossible. Appellant maintains a curative instruction, at the very least, was required to mitigate the effect of the prosecutor's inflammatory rhetoric. Appellant raises a similar complaint about the prose-

cutor's closing statement, which Appellant claims invited the jury to imagine Appellant had committed other crimes not of record and to speculate using an improper and irrelevant 'what if' scenario. Appellant insists the trial court should have sustained counsel's objection and issued a requested curative instruction at a minimum. Absent remedial measures, Appellant submits it is likely the jury was unduly prejudiced against Appellant, which calls the integrity of the verdict into question. On these grounds, Appellant concludes she is entitled to a new trial. We disagree.

■ "Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Solomon,* 25 A.3d 380, 383 (Pa.Super.2011). "In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one." *Id.* Not every inappropriate remark by a prosecutor constitutes reversible error. *Commonwealth v. Harris,* 884 A.2d 920, 927 (Pa.Super.2005), *appeal denied,* 593 Pa. 726, 928 A.2d 1289 (2007). A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. *Solomon, supra* at 383. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict. *Commonwealth v. Rolan,* 964 A.2d 398, 410 (Pa.Super.2008).

■ In the present case, the prosecutor's opening statement included a refer-

---

**10.** The Commonwealth properly offered Appellant's statements to Chief Leahy as party admissions. *See* Pa.R.E. 803(25)(A). Likewise, Appellant affirmed the truth of Mr. Gardner's statements to Chief Berry and Chief Leahy, so Mr. Gardner's statements be-

came adoptive admissions. Pa.R.E. 803(25)(B). The propriety of admitting Mr. Gardner's statements at trial was not raised or argued on appeal. Therefore, we decline to address that topic.

ence to the Luzerne County bribery scandal to illustrate his point that there is no type of "minor" public misconduct. Defense counsel objected, and the court sustained the objection. At sidebar, counsel requested a mistrial or, in the alternative, cautionary instructions. The court denied both requests. The prosecutor's comments, assuming they were improper, were not so prejudicial as to deny Appellant a fair trial. Not only did the court sustain defense counsel's objection, it had also previously instructed the jury that opening statements of counsel were not evidence and could not be the basis for a verdict. In this light, any possible impact from the prosecutor's remark was marginal. The prosecutor's opening remarks were not evidence and did not prejudice Appellant to the extent a new trial is necessary. *See Rolan, supra.*

Further, we reject Appellant's contention that the prosecutor's closing argument constituted reversible misconduct. The comment in question was a hypothetical, in which the prosecutor stated, "What if, on February 15, 2008, Appellant makes a notation ... '[Mr. Gardner] tests positive for drug use.' She puts that on [Mr. Gardner's] file.... Would that be a big deal? Of course it would." (*See* N.T. Trial, 9/17/09, at 15). Defense counsel again objected, and the court overruled the objection. In context, this statement was not an improper reference to facts not in evidence. Defense counsel had previously argued Appellant's falsified entry in Mr. Gardner's probation file was immaterial and could not constitute a crime. The prosecutor used the drug hypothetical to counter counsel's point and suggest that any false notation in a probation file is material. This hypothetical was a fair and accurate response to defense counsel's argument and fails to provide grounds for a new trial. *See Solomon, supra.* As nei-

ther remark constituted reversible misconduct, no new trial is required on the grounds asserted. Based on the foregoing, we affirm the judgment of sentence.

Judgment of sentence affirmed.